# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 15-631V
Filed: August 22, 2016
PUBLISHED

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
| | |
|---|---|
| DANIEL NEIMAN and ALLYSON F., NEIMAN, as parents and legal Representatives of their minor son N.K.N. | \* \* \* \* \* |
| Petitioners, | \* |
| v. | \* |
| | \* |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | \* \* \* |
| Respondent. | \* \* |

Ruling on Pain and Suffering;
Rotavirus;
Intussusception;
Special Processing Unit ("SPU")

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Elizabeth Martin Muldowney*, Rawls, McNelis and Mitchell, P.C., Richmond, VA, for petitioners.
*Camille Michelle Collett*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON PAIN AND SUFFERING[1]

**Dorsey**, Chief Special Master:

On June 19, 2015, petitioners filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioners alleged that following administration of a number of vaccinations, including rotavirus vaccine, N.K.N. developed severe intussusception requiring surgical intervention. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. For the reasons described below, the undersigned now finds that petitioners are entitled to an award of damages in the amount of $144,000.00 for past pain and suffering and $74,000.00 (to be reduced to net present value) for future pain and suffering.

---

[1] Because this ruling contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I. **Procedural History**

Following the filing of the petition, petitioners filed medical records, photographs, and affidavits marked as exhibits 1 to 12 on June 25, 2016. (*See* ECF No. 6, Notice of Intent to File on Compact Disc.)  Petitioners filed their statement of completion on June 26, 2015. (ECF No. 7.)  An initial status conference was held with the staff attorney managing this case on July 27, 2015. (ECF No. 9.)

After conducting her initial review of this case, respondent reported that she was willing to enter into informal settlement discussions on September 10, 2015. (ECF No. 12.)  Settlement discussions continued until June of 2016 when the parties advised at a status conference held with the staff attorney managing this case on June 8, 2016, that they had reached an impasse regarding the appropriate amount of compensation for pain and suffering. (ECF No. 27.)  Additional medical records marked as Exhibit 13 and a letter by N.K.N.'s pediatrician marked as Exhibit 14 were filed during the course of settlement negotiations. (ECF Nos. 21, 25.)

Immediately prior to the June 8, 2016 status conference, respondent filed her Rule 4 Report conceding that petitioners were entitled to compensation for N.K.N.'s intussusception.[3] (ECF No. 24.)  At the status conference, the parties requested a ruling by the undersigned regarding the issue of appropriate compensation for pain and suffering but expressed confidence in their ability to resolve the remaining elements of petitioners' damages. (ECF No. 27.)  Petitioners' counsel also requested an opportunity to further supplement the record before submitting the issue for the undersigned's decision. (*Id*.)  The parties were ordered to file simultaneous briefs stating their respective positions regarding the question of compensation for pain and suffering as well as a stipulation concerning all other elements of petitioners' damages. (*Id*.)

On June 9, 2016, a Ruling on Entitlement was issued finding petitioners' entitled to compensation based on respondent's concession.  (ECF No. 26.)  Petitioners subsequently filed Exhibits 15-19 on July 11, 2016, consisting of a photograph of N.K.N.'s post-surgical scar as well as affidavits by both of N.K.N.'s parents and his pediatrician. (ECF No. 28.)

On August 10, 2016, the parties filed a joint stipulation agreeing that petitioners should be awarded $5,992.21 in past unreimbursed out-of-pocket medical expenses. (ECF No. 31.)  The parties further stipulated that there are no other elements of compensation to be considered other than pain, suffering, and emotional distress. (*Id.*)  Also on August 10, 2016, the parties filed simultaneous briefs setting forth their respective positions regarding the appropriate amount of pain and suffering compensation to be awarded in this case. (ECF Nos. 32, 33.)

This case is now ripe for a ruling on pain and suffering.

---

[3] Petitioners' claim was filed prior to the inclusion of intussusception on the Vaccine Injury table; however, the case was conceded on a causation-in-fact basis. (*See* ECF No. 26, p. 5.)

2

## II.   Factual History

N.K.N. was born on September 16, 2013. (Ex. 5, p. 32.)  On November 21, 2013, he had his two month old well-child pediatric visit with Dr. Steven Althoff at which no problems were noted. (Ex. 8, p. 7.)  At this visit he was administered several vaccines, including his first dose of (Rotarix) rotavirus vaccine. (Ex. 8, p. 7; Ex. 6, p. 2.)

On November 26, 2013, N.K.N.'s mother noted him to be fussy and lacking appetite. (Ex. 8, p. 15; Ex. 2, p. 2.)  He was subsequently found to have a bloody diaper with blood and mucus mixed with brown stool. (Ex. 8, p. 15.)  Petitioners contacted Dr. Althoff who instructed them to go to the emergency room, which they did. (Ex. 8, p. 15.)

At the emergency room, an abdominal x-ray was performed which was interpreted as showing "dilated small bowel suggesting presence of small bowel obstruction." (Ex. 8, p. 17.)  N.K.N. was thought to have intussusception and a barium enema procedure was ordered. (Ex. 8, pp. 18-19.)  The intussusception could not be reduced after multiple attempts, and N.K.N. was admitted to surgery on an emergent basis. (Ex. 5, p. 97; Ex. 8, pp. 17-19; Ex. 10, p. 2.)

On November 27, 2013, Dr. Frieda Hulka performed an exploratory celiotomy, ileocecal resection and appendectomy, and an end-to-end ileocolic anastomosis. (Ex. 10, p. 2.)  The postoperative diagnosis was intussusception with necrotic intestines. (*Id.*)  N.K.N.'s "distal 4 inches of the small intestine and right colon and cecum as well as the appendix were necrotic." (*Id.*)  In the operative report, Dr. Hulka explained that due to the "extensiveness of the bowel resection," a central line was placed to monitor the infant postoperatively. (Ex. 10, p. 2.)  The pathology specimen report documents that three portions of necrotic bowel were removed "ranging in length from 27 to 3 cm." (Ex. 5, p. 91.)

Post operatively, N.K.N. remained intubated and was taken to pediatric intensive care to await GI function. (Ex. 10, p. 7.)  He was treated with antibiotics for suspected infection and remained sedated and intubated. (Ex. 5, pp. 101-114.)  On November 28, 2013, N.K.N. was found to be anemic and received a blood transfusion. (Ex. 5, pp. 104, 648.)  He was extubated on November 29, 2013, after two days of ventilation, but still had intermittent mild stridor and was started on heliox.[4] (Ex. 5, p. 114.)  He remained in pediatric intensive care through December 1, 2013, and remained hospitalized for seven days postoperatively in total. (Ex. 5, pp. 68-69, 96.)  Petitioners have submitted a photograph dated July 8, 2016, which shows that about two and a half years later, N.K.N.'s surgical scar remains visible. (Ex. 19.)

On December 13, 2013, N.K.N. was seen for a postoperative follow up with Dr. Hulka.  (Ex. 10, p. 2.)  He was noted to be "doing well" with no significant postoperative

---

[4] Heliox is a low-density mixture of helium and oxygen that reduces resistance to flow within the airways. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., p. 829

3

complications and no evidence of infection or hernia. (*Id*.)  It was specifically noted that he was eating well and had "minimal loose stools." (*Id*.)

Subsequently, N.K.N. had well-child visits at four, six and nine months of age. (Ex. 8, pp. 9-11.)  At these visits, minimal references were made to N.K.N.'s bowel function. (*Id*.)  At N.K.N.'s six month visit, it was noted that he had "soft, formed" stools, but was negative for diarrhea. (Ex. 8, p. 9.)  However, at N.K.N.'s 12 month well visit, under parental concerns it was noted "still no solid stools." (Ex. 13, p. 2.)  N.K.N.'s stools were further noted to be "soft, not formed." (*Id*.)

At ten months of age, N.K.N. was referred to Dr. Juan Gregory, a gastroenterologist, for suspected hepatomegaly. (Ex. 11, p. 1.)  Dr. Gregory concluded that there was no clinical evidence of hepatomegaly, but also noted that N.K.N. had had his ileal cecal valve removed and stressed that "with distal small bowel resection [N.K.N.] may have slightly more loose stools while there is adaptation of the small bowel." (Ex. 11, p. 3.)  Dr. Gregory further indicated that "with large resections of the distal small bowel the possibility [of] symptoms of fat soluble vitamin/zinc/selenium/iron malabsorption may occur."[5]  (*Id*.)

Little is mentioned regarding the quality of N.K.N.'s stools during his 15 month and 18 month check-ups. [6]  At 15 months, his stools were noted to be "soft" but "formed." (Ex. 13, p. 4.)  At 18 months, no specific mention is made of N.K.N.'s bowel movements, but he is noted to be a child with special healthcare needs[7] and, even at this late date, is specifically noted to be "s/p" or "status post"[8] bowel resection. (Ex. 13, p. 5.) At about 2 years of age, during N.K.N.'s 24-30 month check-up on October 14, 2015, his stools were characterized as "loose" and "pasty."[9]  (Ex. 13, p. 7.)  N.K.N.'s pediatric records otherwise reflect normal growth and development. (*See, e.g.* Ex. 15.)

---

[5] Respondent contends, presumably based on the specific notation that "the remainder of the complete review of symptoms was negative," that N.K.N.'s gastroenterologist "observed no GI issues at that time." (ECF No. 33, p. 7.)  Contrary to respondent's interpretation, the undersigned does not view this record taken as a whole as indicating that Dr. Gregory observed no GI issues.  In fact, in his impression and recommendations, Dr. Gregory stressed N.K.N.'s history of intussusception, bowel resection, and lack of ileal cecal valve.  He further noted that this leaves N.K.N. susceptible to loose stools and malabsorption and recommended that if N.K.N. were to develop any *new* gastrointestinal complaints, he should return for follow up. (Ex. 11, p. 3.)  Significantly, the fact of a referral to a gastroenterologist is itself suggestive of GI issues.  That those GI issues may have been initially attributed to suspected hepatomegaly is of no significance where hepatomegaly was subsequently ruled out.

[6] Respondent suggests that N.K.N.'s 15 and 18 month exams note his elimination history to be "normal." (ECF No. 33, p. 5.)  Upon review of the records, the undersigned does not agree with such a characterization.

[7] Significantly, N.K.N.'s records are not suggestive of any special healthcare need other than his bowel issues.  At the time this notation was made, his development was noted to be on track.

[8] *See* Davis, Neil M., *Medical Abbreviations: 32,000 Conveniences at the Expense of Communication and Safety, 15th Ed.*, p. 304.

[9] Respondent interprets the notation of loose stools as being attributable to an intercurrent illness, contending that the notation reads "loose [with] URIs[ymptoms]." (ECF No. 33, p. 5, fn. 5.)  Respondent stresses that "had loose stools been a postoperative issue, it would have been an ongoing problem since

In supplemental affidavits filed in this case, both of N.K.N.'s parents aver that N.K.N. continues to experience significant difficulty with his bowels. (Exs. 17-18.) The parents report that N.K.N. is prone both to very loose or "mushy" stools and very hard "boulder"-like stools. (*Id*.) Mr. Neiman additionally noted that N.K.N.'s constipation is sometimes so severe that his parents must give him a rectal suppository. (Ex. 17, p. 1.) Both parents report that, now at about three years of age, N.K.N.'s difficulties are interfering with his potty training and daycare experience. (Ex. 17, p. 2; Ex. 18, p. 2.) Mr. and Mrs. Neiman also both report that N.K.N.'s condition requires them to carefully monitor his diet. (*Id*.) Significantly, Mrs. Neiman averred that N.K.N. has vocalized the pain that his bowel movements cause him, making statements such as "my poopy hurts" or "my bottom hurts." (Ex. 18, p. 1.) His daycare attendants have suggested that he appears "terrified" to pass a stool. (*Id*.)

Mr. and Mrs. Neiman's averments are further supported by statements by N.K.N.'s pediatrician. In an undated letter filed June 8, 2016, Dr. Althoff noted that N.K.N. "recovered well after [his] bowel obstruction, but does continue to have soft, poorly-formed stools; most likely as a result of the loss of his ileocecal valve." (Ex. 14.) He additionally opined that N.K.N. "will probably never make fully formed stools in the future." (*Id*.) In a subsequent affidavit dated July 7, 2016, Dr. Althoff again noted that N.K.N. "continues to have loose stools" and further opined "that this condition will likely impact [N.K.N.] throughout his life." (Ex. 16.) Dr. Althoff further observed that:

> Because he will suffer from on-going loose stools, it is likely that he will have difficulty toilet training and may require modification to his diet as he develops to address any aggravation the introduction of new foods may cause. Also, as he develops, [N.K.N.] will likely continue to have abnormal bowel function which may include bouts of diarrhea and constipation.

(Ex. 16.)

### III. Party Contentions

#### A. Petitioners' Memorandum

Petitioners' note that pain, suffering and emotional distress are "highly subjective and fact intensive," but urge that the severity of N.K.N.'s injury should be assessed based on "(1) N.K.N.'s period of hospitalization, to include time he was admitted to the Pediatric Intensive Care Unit; (2) the surgical intervention required to treat N.K.N.'s intussusception, to include [the] seriousness of

---

the surgery." (*Id*.) The undersigned notes, however, that this notation appears in the record of a well-child visit for which no concerns of illness were listed. The undersigned also notes that the notation in question is not very legible and may not say URI at all. In any event, the fact that the loose stools were linked to an intercurrent illness does not necessarily mean they are not part of a pattern of postoperative gastrointestinal problems. *See Brooks v. HHS*, No. 14-563V, 2016 WL 2865709, *4-5 (Fed. Cl. Spec. Mstr. Mar. 12, 2016) (awarding compensation for future pain and suffering for anticipated future loose stools expected post-bowel resection and in conjunction with intercurrent illnesses).

intraoperative findings and postoperative complications; (3) the nature of the residual effects of N.K.N.'s injury, including permanency of condition, and complication of same; and (4) future expectations with respect to N.K.N.'s condition." (ECF No. 32, p. 8.)

Petitioners request a total of $157,000.00 in past pain and suffering. (ECF No. 32, p. 8.) This figure represents $100,000.00 in compensation for N.K.N.'s surgery itself, $28,000.00 for his five days in pediatric intensive care, $4,000.00 for his additional two days of hospitalization, and $25,000.00 for his postsurgical complications, including anemia, blood transfusion, and respiratory insufficiency. (*Id*.)

In addition, petitioners urge future pain and suffering in the amount of $93,000.00 (reduced to a net present value of $79,053.00), which represents the full remaining amount of compensation remaining under the statutory $250,000.00 cap on damages. (ECF No. 32, p. 9.) This figure represents $4,000.00 for an anticipated two years of difficulty with potty training as well as $148,000.00 for anticipated future lifetime moderate complications of a shortened bowel. (*Id*.) Petitioners calculate a 74 year life expectancy and request $2,000.00 a year for this lifetime pain and suffering. (*Id*.)

Petitioners urge that the undersigned should be guided by the prior decision regarding pain and suffering in *Brooks v. HHS*, No. 14-563, 2016 WL 2865709 (Fed. Cl. Spec. Mstr. Mar. 12, 2016). (ECF No. 32, p. 9.) In that case, the undersigned awarded $144,000.00 for past pain and suffering and $70,000.00 for future pain and suffering in an unusually severe intussusception case. Petitioners contend that this case is "factually indistinguishable" from the *Brooks* case. (*Id*.)

### B. Respondent's Memorandum

Respondent stresses that historically the Office of Special Masters has awarded damages on a continuum, mindful of the $250,000.00 statutory cap. (ECF No. 33, pp. 10-11.) That is, typically awards meeting the cap are reserved for the most severely injured.[10] (ECF No. 33, p. 10.) Respondent contends that the relevant factors to consider are: "(1) the ability of the injured individual to understand the injury; (2) the severity of the injury; and (3) the potential number of years the individual is subjected to the injury." (*Id*.)

With these factors in mind, respondent argues that N.K.N., as an infant, has no recollection of his surgery and course of hospitalization. (ECF No. 33, p. 12.) Moreover, respondent stresses that N.K.N. did not experience any postoperative complications and his parents reported in follow up visits that he had resumed normal activities. (ECF No. 33, p. 7.) Respondent further argues that there is not preponderant evidence that N.K.N. has suffered or will continue

---

[10] Respondent does acknowledge, however, that in *Graves v. HHS*, 109 Fed. Cl. 579 (2013), one judge of the Court of Federal Claims held to the contrary.

to suffer sequela of his injury. (ECF No. 33, p. 12.) In that regard, respondent contends that "there are no medical records that support the continuous and severe elimination difficulties described in petitioners' affidavits." (ECF No. 33, p. 7.) Respondent contends that petitioners' affidavits alone cannot support a finding that N.K.N. has had ongoing gastrointestinal issues and further that Dr. Althoff's affidavits cannot be credited in favor of his medical records, which respondent argues are contradictory. (ECF No. 33, pp. 6, 8.)

Citing a number of prior intussusception cases, respondent contends that the typical award for intussusception is $35,000.00. (ECF No. 33, p. 13.) Respondent disputes that N.K.N.'s case rises to the same level of atypical severity found in the undersigned's *Brooks* decision. (ECF No. 33, pp. 13-14, fn. 11.) Respondent "submits that N.K.N.'s presentation is very consistent with a typical course of intussusception resolved with surgical resection commonly seen and compensated in the Vaccine Program," and proposes an award in this case of $35,000.00. (ECF No. 33, p. 14.)

### IV. Finding of Fact

The medical records show that the status of N.K.N.'s stool formation was being consistently monitored throughout his postsurgical pediatric care. It was discussed immediately following his surgery (minimal loose stools noted), at six months of age (soft, formed), at 12 months of age ("still no solid stools"), at 15 months of age (soft but formed), and at 24 months (loose and pasty). (*See* Ex. 10, p. 2.; Ex. 8, pp. 9; Ex. 13, pp. 2, 4, 5, 7.) Significantly, these records explicitly show that these issues were an *ongoing* concern. Indeed, Dr. Althoff referred N.K.N. to a gastroenterologist at 10 months of age.[11]

In particular, the undersigned gives credence to the contemporaneous records which show that at 12 months of age, and 10 months post-surgery, N.K.N.'s parents reported "*still* no solid stools" (Ex. 13, p. 2 (emphasis added)) and that at 18 months N.K.N.'s pediatrician was identifying him as a child with special healthcare needs and specifically as status post bowel resection. (Ex. 13, p. 5). Ordinarily medical records "warrant consideration as trustworthy evidence." *Cucuras v HHS.*, 993 F.2d 1525, 1528 (Fed.Cir.1993).

Moreover, Dr. Althoff indicated that N.K.N. will "likely continue to have abnormal bowel function which may include bouts of diarrhea and constipation," and "N.K.N. will probably never make fully formed stools in the future." (Exs. 14, 16.) Thus, Dr. Althoff concludes that N.K.N. is facing a lifetime of abnormal bowel function, a view that is also suggested, though less explicitly, by his records. Dr. Althoff's opinion is further buttressed by N.K.N.'s treating gastroenterologist, who noted that loose stools and malabsorption are expected following large resections of the small bowel. (Ex. 11, p. 3.)

---

[11] As noted in footnote 5, *supra*, the fact of a referral to a gastroenterologist is itself suggestive of GI issues notwithstanding that the referral was initiated due to suspicion of hepatomegaly.

The undersigned finds Dr. Althoff's affidavit to be consistent with his medical records. As described above, Dr. Althoff documents abnormal stools at six, 12, 15, and 24 months of age. Moreover, even accounting for the fact that none of the medical records specifically note the constipation described by N.K.N.'s parents, "it must be recognized that the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance. Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant." *Murphy v. HHS*, 23 Cl. Ct. 726, 733 (Fed. Cl. 1991)(*aff'd* 968 F.2d 1226 (Fed. Cir. 1992)). Here, it is obvious from the medical records as well as from Dr. Althoff's sworn statement that Dr. Althoff continued to track N.K.N as a child with ongoing gastrointestinal problems.

In light of these records and medical opinions which corroborate their affidavits, Mr. and Mrs. Neiman's statements also constitute persuasive evidence of N.K.N.'s ongoing gastrointestinal problems. It is noteworthy that compared to Dr. Althoff's sparse note taking, Mr. and Mrs. Neiman's affidavits are detailed first-hand accounts of what N.K.N. and his parents experience on a daily basis.[12] Mr. and Mrs. Neiman have provided added insight into the extent of parental concern that underlay a medical record notation as seemingly simple as "still no solid stools" or that may not be reflected by any comment at all.

For all of the above reasons, the undersigned finds by a preponderance of the evidence that N.K.N. has had and will continue to have abnormal bowel function throughout his life.

### V. Assessing the Appropriate Amount of Compensation

In light of the above finding of fact, petitioners are correct that the level of severity in this case is comparable to that of the child in the undersigned's decision in *Brooks v. HHS*, No. 14-563V, 2016 WL 2656110 (Fed. Cl. Spec. Mstr. Mar. 12, 2016), a case which the undersigned noted to be higher than most prior awards for intussusception in the Vaccine Program.

In *Brooks*, the undersigned awarded $144,000.00 in past pain and suffering to a child who underwent significant surgery, including the resection of approximately 40 centimeters of necrotic bowel and who remained hospitalized for approximately 7 days postoperatively. *Brooks*, 2016 WL 2656110 at *2, 5. Although N.K.N.'s pathology report does not document the entire amount of bowel removed, the total appears similar to that in the *Brooks* case. N.K.N.'s surgery also included an appendectomy as well as removal of N.K.N.'s cecum and part of his colon. And while the *Brooks* child's overall hospitalization was longer (he was hospitalized several days preoperatively), N.K.N. experienced five days of intensive care, including two days of mechanical ventilation and underwent a blood transfusion.

---

[12] Respondent characterizes the affidavits as "emotionally compelling." (ECF No. 33, p. 6.)

In addition, the *Brooks* child was expected to have continued gastrointestinal difficulty at times, particularly in conjunction with intercurrent illnesses. *Brooks*, 2016 WL 2656110 at *4. The undersigned awarded compensation for future pain and suffering in the *Brooks* case in the amount of $70,000.00 reduced to a present value of $38,248.00. *Brooks*, 2016 WL 2656110 at *5; *Brooks v. HHS*, No. 14-563V, 2016 WL 2865709 (Fed. Cl. Spec. Mstr. Mar. 10, 2016). This represented $1,000.00 per year over a life expectancy of 70 years. Like the *Brooks* child, evidence in this case suggests that N.K.N.'s gastrointestinal problems are likely to continue in the future. Dr. Althoff opined that N.K.N.'s abnormal bowel function may remain persistent throughout his life, including bouts of diarrhea and constipation, and that N.K.N. may require diet modification to account for aggravation caused by the introduction of new foods. (Ex. 16.)

Notwithstanding factual nuances, the undersigned agrees with petitioners that on balance, when taking all factors into account, the instant case is "factually indistinguishable" (ECF No. 32, p. 9.) from the *Brooks* case in terms of each child's overall pain and suffering. Therefore, the undersigned awards petitioners compensation for pain and suffering comparable to what was recently awarded in the *Brooks* case.

## VI. Conclusion

For all the reasons described above, and based on consideration of the record as a whole, the undersigned finds that $144,000.00 represents a fair and appropriate amount of compensation for N.K.N.'s past pain and suffering. The undersigned further finds that an award of $1,000.00 per year over a 74 year life expectancy ($74,000.00) is a fair and appropriate amount of compensation for N.K.N.'s future pain and suffering. In addition, the undersigned finds based on the parties' joint stipulation that petitioners are entitled to $5,992.21 in past unreimbursable medical expenses.

**Therefore, the undersigned directs the parties to file a joint status report by no later than <u>September 19, 2016</u>, converting the undersigned's award of future pain and suffering to the net present value.**

**IT IS SO ORDERED.**

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Chief Special Master